# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |
|---|---|
| KD, PARENT, NATURAL GUARDIAN AND NEXT FRIEND OF LD; AND JD, PARENT, NATURAL GUARDIAN AND NEXT FRIEND OF LD; <br><br> Plaintiffs, <br><br> vs. <br><br> DOUGLAS COUNTY SCHOOL DISTRICT NO. 001, DANIEL BARTELS, BRIAN ROBESON, JOE DOE, and JANE DOE, <br><br> Defendants. | 8:17CV285 <br><br> MEMORANDUM AND ORDER |

This matter is before the Court on the Motions for Summary Judgment filed by Defendant Douglas County Public School District No. 001, a/k/a Omaha Public Schools (OPS), ECF No. 124, and Defendant Daniel Bartels, ECF No. 132. Also before the Court are Plaintiffs' Motion in Limine, ECF No. 148, and Defendants' Joint Objection to the Magistrate Judge's Preliminary Pretrial Order, ECF No. 167. The Motions for Summary Judgment will be granted and the Motion in Limine and Objection will be denied as moot.

## BACKGROUND

The following facts are those stated in the parties' briefs, supported by pinpoint citations to admissible evidence in the record, in compliance with NECivR 56.1[1] and

---

[1] *See* NECivR 56.1(b)(1):

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

Federal Rule of Civil Procedure 56. The Court has also drawn from the parties' joint statement of uncontroverted facts.

## I. The Parties

Plaintiff LD was a student in her 7th and 8th Grade years in OPS at Alfonza Davis Middle School ("Davis Middle School") from August 14, 2013, through May 22, 2015. The 2013-14 school year was the first year that Davis Middle School was open. LD attended Marian High School beginning in the fall semester 2015 as a freshman and graduated with honors in May 2019. At Marian High School, LD was a member of the National Honor Society, Mu Alpha Theta Math Society, the Quill & Scroll journalism honorary society, and participated in various clubs and sports. Plaintiffs KD and JD are LD's parents. MD is LD's older sister and was three grades ahead of LD in school. ND is LD's younger sister.

OPS is a political subdivision and school district. Daniel Bartels is an administrator employed by OPS and during the relevant time was Principal of Davis Middle School.

Defendant Brian Robeson was formerly employed by OPS and taught at Davis Middle School. OPS interviewed Robeson and received satisfactory written references for him before he was hired. Robeson disclosed on his application that he had a DUI, which did not disqualify him from teaching, because he was not being hired to drive students.[2] Before hiring Robeson, OPS checked the child abuse registry, which showed no entries for Robeson, and checked for criminal background through a private agency.

---

[2] At OPS, criminal convictions were not a bar to employment, but were considered only in relation to specific job requirements. A DUI was not an automatic basis for termination of a teacher as long as he or she fulfilled the duties of the job.

By 2006, Robeson had a Master of Science Degree in Elementary Education with a concentration in math and science.

Robeson taught from August 2003 to 2013 at OPS's Prairie Wind Elementary School and received satisfactory evaluations. He taught sixth grade for several years. In 2013, he transferred from Prairie Wind Elementary to Davis Middle School, because Prairie Wind Elementary was eliminating its 6th Grade. After transferring, Robeson taught 7th Grade pre-algebra and algebra, and a "Take Flight Class." Bartels did not know Robeson until he was assigned to teach at Davis Middle School. Robeson's classroom was Room 150, which was the first classroom in the 7th Grade wing of the school. In 2013-14, Robeson taught algebra to LD. She was also in Robeson's "Take Flight Class." Robeson was not LD's teacher in 2014-15 when she was in 8th Grade.

## II. Overview of OPS Policies

The OPS Board of Education (BOE) has the power to hire, suspend and terminate teachers. Neb. Rev. Stat. §79-827. In order to exercise its rights and duties, the BOE prepared and published policies and regulations covering organization, policies, and procedures of the school system. OPS had policies in effect for the 2013-15 school years which prohibited sexual harassment and provided a complaint system for the reporting of sexual harassment.

During the relevant time, no formal OPS policies prohibited teachers from hugging students or being alone in a classroom with a student. Yet OPS had specific policies related to employee-to-student harassment, teacher boundaries, reporting of suspected child abuse, and educator misconduct. These policies were included in several publications distributed to principals, teachers, and other employees.

3

OPS had a specific policy regarding teacher boundaries, independent of the employee-to-student harassment policy, including guidelines for electronic communication, romantic relationships, gift giving, special treatment, and other signs of grooming. The policy made clear that students cannot consent to such conduct. In the 2013-14 school year, OPS implemented district-wide training for all staff regarding prevention of adult sexual misconduct and reporting of child abuse and neglect. OPS refreshed the training annually.

The OPS Department of Student and Community Services periodically issued "Intercommunications Memos" to Principals, Assistant Principals, Deans of Students, Counselors, and others regarding "Reporting of Abuse and Neglect," which also included procedures for reporting harassment and abuse. Recipients were instructed to review the reporting procedures with all staff. For the 2014-15 and 2015-16 school years, OPS distributed a "Principal Packet" to all district principals. The Principal Packet included a memo with flow charts for the reporting of harassment. Principals were to review the procedures in a staff meeting at the beginning of each school year.

The Davis Middle School Student Handbooks for 2013-14 and 2014-15 included a definition of sexual harassment. The Handbooks also described the process for reporting sexual harassment by an employee or visitor, the options and process for reporting abuse and neglect, and the phone number for the Assistant Superintendent for Student and Family Services. The policies applied to all school-sponsored activities on or off campus, and included an explanation of confidentiality, a prohibition of retaliation, and an appeal process.

The parties agree that the OPS superintendent had primary responsibility for enforcing school policies for teachers. The superintendent delegated that responsibility to OPS Human Resources and school principals, depending on the situation and the context. Principals enforced policies with the support of Human Resources. Bartels considered it his job to investigate reports of misconduct and to use his discretion and skills as a principal to determine whether reports were substantiated.

### III. Reports of Robeson's Behavior During the 2013-14 School Year

In August 2013, Counselor Jen Walker reported to Bartels that staff members, herself included, witnessed Robeson hugging many students, male and female. Bartels Dep. 57:24–58:16, 58:20–62:1, ECF No. 128-1. Bartels responded by coaching Robeson on proper interactions with students, including a physical demonstration of how to use a side hug and high five. Bartels Dep. 40:19 – 41:5, ECF No. 128-1.

Later in the 2013-14 school year, teacher Christine Jurgens spoke to Bartels about Robeson giving prolonged hugs to students, not including LD. Jurgens stated that she and Bartels together once observed Robeson give a prolonged hug. Jurgens Dep. 50:24–53:7, ECF No. 128-5. Bartels responded by having a discussion with Robeson which stopped the hugging for a few days.

LD transferred from the Westside School District to OPS for her 7th Grade year. She had been reluctant to attend Davis Middle School because she would miss her friends. She was randomly assigned to Robeson's "Take Flight Class" in 7th Grade and was transferred from pre-algebra to algebra as a result of placement testing and her parents' request. Robeson was the only algebra teacher at Davis Middle School. Robeson knew LD and her family because they attended the same church.

On April 23, 2014, Bartels was informed that Robeson was mentoring LD in his classroom. Bartels told Robeson to stop immediately and explained that Robeson needed to seek permission from LD's parents. Robeson told Bartels that LD's parents wanted Robeson to mentor her. At some point, LD's parents gave permission for Robeson to have lunchtime meetings with LD outside the classroom. The lunches were to take place somewhere in the administrative office area.

## IV. Reports of Robeson's Behavior During the 2014-15 School Year

Early in September 2014, Instructional Facilitator Jennie Meyer reported that LD, now in 8th Grade, and several of her friends were going to the 7th Grade floor. Later in the fall of 2014, Meyer reported that she saw LD in Robeson's classroom with the door open. Because LD was crying, Assistant Principal Amy Ellis went to the classroom and inquired why LD was at that location and why she was crying. Robeson responded that LD was okay and on her way to class. Ellis suggested that LD see a counselor, but LD went on to her class.

On October 20, 2014, LD spoke to Walker about the way counselor Chris Johnson looked at her. Later, Walker spoke to Bartels and to LD's mother to address the situation. Bartels visited with Johnson.

In November 2014, Bartels walked by Robeson's classroom and observed Robeson and LD eating lunch in his classroom with the door open. Bartels asked them what they were doing, and both responded they were having lunch and doing their mentoring. Bartels reminded them that mentoring needed to take place in the administrative office. Later that day, Bartels met with Robeson and reminded him that it was his responsibility as a mentor to make sure mentoring occurred in the office, and not

his classroom. Later that semester, Bartels gave permission for the mentoring to take place in the conference room next to the principal's office, provided that the door was open and both Robeson and LD could be viewed from the hallway.

Sometime in late winter of the 2014-15 school year, likely February 2015, Walker, informed Bartels that a coach[3] saw Robeson tie LD's shoe in the hallway by the girl's locker room when other athletes and coaches were present. Bartels asked Robeson about the incident and he denied it happened.

On March 4, 2015, an unsigned handwritten note was left in Bartels's mailbox. It said, paraphrased, "I find it curious that LD is absent on the same day as Mr. Robeson." Bartels Dep. 82:25–83:18, ECF No. 128-1. Bartels discussed the note with Assistant Principal Amy Ellis but they could not identify the author from the handwriting. The note was discarded. On the same day, Bartels called LD's father to verify LD's absence. LD's father informed Bartels that LD was home ill.

In April 2015, paraprofessional Chantalle Galbraith reported that she saw Robeson grab LD's phone from her back pocket. Galbraith was concerned because staff had just received training about possessing student property. Bartels asked Robeson to explain what happened. Robeson's report was consistent with Galbraith's. Bartels warned Robeson not to engage in that type of conduct.

Later in the spring of 2015, Galbraith saw Robeson hug[4] LD in the hallway and saw him eating lunch with LD in his classroom, with the door closed and lights dim. In

---

[3] The coach did not want to be identified and Walker did not give the coach's name.

[4] Plaintiffs' statement of this incident implies that Gailbraith saw LD and Robeson hugging in Robeson's darkened classroom. Defendants do not dispute this account in their joint reply but the Plaintiffs'

response, Bartels instructed the security guard to walk by Robeson's classroom. The security guard reported that no one was in the classroom. Nevertheless, Bartels advised Robeson that his conduct was inappropriate and counseled him about proper interactions with students.

On May 1, 2015, Rebecca Stichler, special education resource teacher, emailed Walker, stating: "I am concerned with [LD] and the amount of time that she is spending with Mr. Robeson, her mentor. I am thinking if she needs this much support from him, she should be receiving support or help beside what he can offer her. I meant to catch you earlier." ECF No. 127-21; Bartels Dep. 253:24 – 254:7, ECF No. 128-1. Walker responded later that day, stating: "I agree that is a concern. I have worked with her a little bit on some friendship issues but have not seen her lately. I will call [LD's] family and offer some additional resources." ECF No. 127-21. Bartels was copied on Walker's response. Walker also informed Bartels that she had noticed LD in Robeson's classroom and in the hallway outside that room very frequently in the week before May 1, 2015. Bartels understood that Walker contacted LD's parents to discuss the activity. Bartels Dep. 22:12–23:1, 42:14–19, ECF No. 128-1.

Friday, May 22, 2015, was the last day of school for students and the day before Memorial Day weekend. On that day, Stichler observed Robeson touch female students and saw him give a "full frontal" hug, chest to chest, with both arms around a female student's body, for approximately 60 seconds. Robeson also kissed a female student on her head. Stichler reported her observations to Bartels. That night, Bartels emailed

<hr>

description is unsupported. The lone reference to this fact is "SOF 127" but Statement of Fact 127 is inconsistent with Plaintiffs' characterization. It states that Gailbraith witnessed a hug outside the classroom. Gailbrath's deposition does not support Plaintiffs' statement.

Stichler, thanking her for sharing her concerns and stated "In addition, if you believe there is wrong doing you probably need to call cps [Child Protective Services] let me know if you do so I can do what I need to do with the information. ECF Nos. 127-23, 127-24. Stichler contacted CPS about the hug and also reported "other behaviors I have seen this school year between [Robeson] and one female student in particular, [LD]. . . . I have observed him poking her in the stomach in a hallway as well as touching her shoulder as if he was giving her a massage. The two spend quite a bit of time together." ECF No. 127-28. CPS told Stichler they would forward her report to the Omaha Police Department (OPD).

On May 26, 2015, Bartels spoke to Robeson and informed him that he had a picture of him hugging a student taken on May 22, 2015. Robeson said he was going to talk to Stichler about it. Bartels advised Robeson not to talk to Stichler. Robeson told Bartels that the student was crying, and she wanted a hug from him after school. Bartels told him that was inappropriate, and he needed to give a side hug if any hug at all. Later that day, Bartels notified Robeson that the incident had been reported to OPS Human Resources. Bartels also admonished Robeson for attempting to confront Stichler.

OPS Human Resources investigated Robeson for the May 2015 hugging incident. That department concluded that Robeson showed inappropriate behavior and needed to have expectations set for him. OPS did not contact the student involved or any parents. OPD and CPS decided not to investigate the incident. OPS Human Resources instructed Bartels to complete an employee consultation conference with Robeson and set specific expectations. Bartels conducted the conference on June 2, 2015.

**V. Reports During the 2015 School Year and Robeson's Arrest**

On December 5, 2015, Jurgens reported to Bartels that Robeson appeared to be sending excessive emails to a former student, MB, a current 9th grader at Northwest High School, using OPS email. Bartels called Shawn Hall at OPS Human Resources and reported that a teacher had seen many emails between Robeson and a former student. On December 7, 2015, Shawn Hall had the OPS IT department pull emails between Robeson and the former student and reviewed them. On December 8, 2015, Hall informed Bartels there would be an HR response to the emails and that he would be working with Chief Human Resources Officer Charles Wakefield.

Hall reviewed over 100 emails between Robeson and MB from August 18 through November 17, 2015. The emails were sent during the school day. Most were mundane, but Robeson used several terms that Human Resources deemed inappropriate including "sweetheart" or "atta baby." Robeson also stated that he missed MB, and said, "I am here for you whenever and however you need me to be… always" and "[y]ou need more entertainment in your life." On or about December 11, 2015, Hall and Kevin Johnson met with Robeson and his union representative to discuss the emails as a violation of Board Policy. Robeson was instructed to cease sending such emails.

The second quarter of the 2015-16 school year ended December 18, 2015, and the winter break began on December 21, 2015. OPS Human Resources was in the process of considering further disciplinary action against Robeson when, on December 29, 2015, OPS was notified of Robeson's arrest for sexual assault of LD. On or about December 30, 2015, OPS cancelled Robeson's teaching contract. On the same day, OPS hand-delivered a letter informing Robeson of the recommendation of cancellation

and informing him of his rights. After the arrest, OPS deferred its investigation of Robeson to OPD and supported them in their investigation.

On January 1, 2016, Bartels printed an email dated April 21, 2014, from Robeson. When printing out the email, Bartels discovered five pages of dialogue between Robeson and LD. Bartels did not notice the dialogue at the time he initially received the email because he viewed it on his phone and thought it contained only two pictures from a field trip Robeson took with students on Saturday, April 21, 2014. Bartels received the email from Robeson in response to Bartels's request for pictures of the field trip.

## VI. Robeson's Sexual Harassment of LD

LD hid her relationship with Robeson and was not aware of anyone else having any knowledge of their sexual relationship. LD did not report Robeson to anyone at Davis Middle School. Neither LD nor her parents ever contacted Bartels regarding any concerns about Robeson.

The physical relationship between Robeson and LD began in September 2014 when they had their first kiss at a creek near LD's home on a teacher work day when students were out of school. Most of the sexual activity between Robeson and LD occurred during LD's 8th Grade year. The two would meet during lunch several times a week in Robeson's classroom. Much of the activity occurred in a corner of the classroom near a cupboard that was tall enough to obscure LD if someone came into the classroom.

The sexual activity continued into the summer between LD's 8th Grade year and her high school freshman year, and into fall of 2015, after she entered high school. To hide her relationship with Robeson, LD used multiple email addresses and often changed

passwords so her mother did not know them. LD deleted messages right after she sent them. LD hid her relationship with Robeson from her sisters and from people at school.

Robeson's conduct toward LD was discovered on December 27, 2015, when he was caught inside the residence of KD and JD. This led to Robeson's arrest and conviction for first degree sexual assault. Robeson is presently serving a 40-year sentence of incarceration in the Nebraska Penal and Correctional Complex.

## STANDARD OF REVIEW

"Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Cottrell v. Am. Family Mut. Ins. Co., S.I.*, 930 F.3d 969, 971 (8th Cir. 2019) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)); *see also* Fed. R. Civ. P. 56(c) ("A party asserting the fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] . . . admissions, interrogatory answers, or other materials . . . .'"). A genuine issue of material fact arises "if each party has supplied some evidence that is sufficient for a reasonable jury to return a verdict for the nonmoving party". *Cottrell*, at 930 F.3d at 971 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party bears the burden of showing 'that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law.'" *Vandewarker v. Cont'l Res., Inc.*, 917 F.3d 626, 629 (8th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). The moving party can satisfy its burden in two ways: (1) by producing evidence negating an

essential element of the nonparty's case; or (2) "by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

In response to the moving party's showing, the nonmoving party must produce evidentiary materials of "specific facts showing the presence of a genuine issue for trial." *Id.* (quoting *Torgerson*, 643 F.3d at 1042). "The nonmoving party must do more than raise some metaphysical doubt about the material facts and cannot rest on mere denials or allegations." *Id.* (citing *Torgerson*, 643 F.3d at 1042; *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)); *see also Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) ("[T]here must be more than 'the mere existence of *some* alleged factual dispute' between the parties in order to overcome summary judgment.") (emphasis in original) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

"At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." *Smith v. Kilgore*, 926 F.3d 479, 483 (8th Cir. 2019) (quoting *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012)); *see also Bedford*, 880 F.3d at 996 ("A principal purpose of the summary-judgment procedure 'is to isolate and dispose of factually unsupported claims or defenses . . . .'") (quoting *Celotex*, 477 U.S. at 323–24). Accordingly, in reviewing a motion for summary judgment, the Court will "view[] the record in the light most favorable to [the nonmoving party] and draw[] all reasonable inferences in [that party's] favor." *Hanson ex rel. Layton v. Best*, 915 F.3d 543, 547 (8th Cir. 2019) (quoting *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009)). "'Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial,' and summary judgment is appropriate." *Vandewarker*, 917 F.3d at 629 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiffs assert six claims for relief: (1) violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et. seq.* ("Title IX") against OPS; (2) violation of constitutional rights under 42 U.S.C. § 1983 against Bartels and Robeson; (3) negligence against OPS and Bartels under the Nebraska Political Subdivisions Tort Claims Act ("NPSTCA"), Neb. Rev. Stat. §13-901 *et. seq.*; (4) battery against Robeson; (5) intentional infliction of emotional distress against Robeson; and (6) aiding and abetting intentional infliction of emotional distress against Bartels. The matters before the Court are the Title IX claim against OPS; the § 1983 claims against Bartels; the negligence claim against OPS and Bartels; and the aiding and abetting claim against Bartels.[5]

### I. Title IX

The Supreme Court has recognized an implied private right of action under Title IX and "a school district can be held liable in damages in cases involving a teacher's sexual harassment of a student." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998) (citation omitted). Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal

---

[5] Plaintiffs' claims against the Doe Defendants will be dismissed because Plaintiffs have not filed an amended complaint identifying the Doe Defendants. Robeson has not entered an appearance.

financial assistance." 20 U.S.C. § 1681(a). To succeed on their Title IX claim, Plaintiffs must prove that OPS was "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur[red] under its control." *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (citing *Ostrander v. Duggan*, 341 F.3d 745 (8th Cir. 2003)). Here, the third element is met because a teacher who sexually harasses a student is deemed to be under the school district's control. *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). However, a school district is not liable for "damages under Title IX for a teacher's sexual harassment of a student absent actual notice and deliberate indifference." *Gebser*, 524 U.S. at 292-293. Plaintiffs have not produced enough evidence to raise a genuine issue of material fact as to the elements of actual knowledge and deliberate indifference.

### A. Actual Knowledge of Acts of Harassment

The "actual knowledge" element has a "credibility component" and a "severity component." *See Thomas v. Bd. of Trustees of the Nebraska State Colleges*, No. 8:12-CV-412, 2015 WL 4546712, at *10 (D. Neb. July 28, 2015), aff'd, 667 F. App'x 560 (8th Cir. 2016). Under the credibility component, actual knowledge of harassment cannot be established by rumors, familiar behavior, prior investigations, and vague complaints. *See Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 457 (8th Cir. 2009); *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 780 (8th Cir. 2001).

In *Doe v. Flaherty*, the Eighth Circuit granted summary judgment to the school, finding insufficient evidence of actual knowledge of a sexual relationship between a teacher and student. 623 F.3d at 585-586. A minor student (Doe) engaged in a sexual

15

relationship with the school's basketball coach (Smith). *Id.* at 580. School administrators knew of previous parental complaints that Smith sent inappropriate text messages to female students and that he specifically sent messages to Doe.[6] *Id.* at 585. The superintendent also learned that Doe may have had a crush on Smith and spent time with Smith in the gym. *Id.* at 581, 585. The school principal also was told that "something was going on" with Doe and Smith. *Id.* at 585.

The court concluded that this evidence was insufficient to suggest a substantial risk of sexual misconduct. *Id.* The content of the messages did not suggest sexual conduct or sexual abuse. *Id.* The "vague inquiry" about "something" going on was insufficient to give actual notice to the principal of Smith's sexual abuse. *Id.* None of the evidence implied physical contact between Smith and Doe, and a reasonable investigation uncovered no evidence to substantiate the suspicions. *Id.* Thus, the court concluded that "[g]iven the stringent standard for supervisory liability in this context, we conclude that no reasonable jury could find actual notice on those alleged facts." *Id.*; *see also Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 780 (8th Cir. 2001) (no actual knowledge where school district "was aware of rumors, investigations, and student statements, but did not possess any conclusive proof" of actual molestation while employed).

Similarly, in *P.H. v. Sch. Dist. of Kansas City, Missouri*, 265 F.3d 653, 662 (8th Cir. 2001), a teacher (Hopkins) and minor student (P.H.) had a two-year sexual relationship, both on and off school grounds. *Id.* at 662. Other teachers complained to school

---

[6] The text messages included the statements "Are you drunk yet?" and "OMG you look good today." *Id.* at 585. Even though there was some dispute as to whether the teacher, Smith, sent the messages at issue, the court concluded that even the most suggestive texts failed to provide notice of sexual conduct or abuse. *Id.*

administrators that Hopkins was spending an inordinate amount of time with P.H., resulting in absences, tardiness, and failing grades. *Id.* at 659, 662. The school also received complaints that Hopkins showed favoritism to some students, including P.H. *Id.* at 662-63. When the principal confronted Hopkins about the complaints, Hopkins explained that P.H. was involved in many of the activities he oversaw, so he naturally spent more time with her than other students. *Id.* P.H. also hid the relationship and did not complain about sexual misconduct until the relationship ended. *Id.* at 660. The court found that, while Hopkins's actions and excessive time spent with P.H. were "cause for concern," *id.* at 659, the evidence was insufficient to establish actual knowledge of sexual misconduct under Title IX. *Id.* at 663.

Here, Plaintiffs claim Bartels and OPS had actual knowledge of Robeson's sexual misconduct based on 14 individual complaints. Some of those complaints, however, did not involve LD. For example, Plaintiffs allege that in 2013 and 2014, several teachers observed Robeson hugging male and female students, some for prolonged periods of time; and in February 2015, paraprofessional Keri McCoy reported to Bartels that she saw girls congregating near Robeson's classroom. None of these reports involved LD and they were not sufficient to give actual notice of sexual harassment. Other complaints were not reported to Bartels or OPS. For example, in April 2014, Robeson participated in a Saturday field trip to the Millard Airport with his Take Flight Class students. There, he kissed LD's forehead while they were participating in a group hug with several female students. LD Dep. 168:3-17, ECF No. 127-2. At a Glo Run activity in May 2014, LD's mother witnessed Robeson pick LD up, throw her onto his shoulder, and cross a finish line. KD Dep. 87:14-88:6, ECF No. 127-33. These complaints did not provide actual notice

of sexual harassment because there is no evidence they were reported to Bartels or any other OPS official.

According to Plaintiffs, Bartels received specific reports about the following instances of Robeson's behavior toward LD.

- In April 2014, Bartels learned Robeson was mentoring LD in his classroom during lunch breaks.

- On several occasions in September 2014, instructional facilitator Jennie Meyer observed LD leave the 8th Grade floor to meet Robeson in his classroom during passing periods.

- In February 2015, staff reported to Bartels that Robeson tied LD's shoelace in the hallway near the girl's locker room.

- On March 4, 2015, Bartels received an unsigned, handwritten note that read, "I find it curious that LD is absent on the same day as Mr. Robeson."

- On May 1, 2015, special education resource teacher Rebecca Stichler emailed school counselor Jennifer Walker stating she was concerned with the amount of time LD spent with Robeson.

None of these reports or complaints gave actual notice of sexual abuse. Like the evidence in *Flaherty* and *P.H.*, these complaints did not suggest there was physical contact between Robeson and LD. Like the "vague inquiry" in *Flaherty*, the unsigned, unsubstantiated note about a curious observation was insufficient to confer actual notice. Like the facts in *P.H.*, complaints about excessive amounts of time or favoritism are insufficient to confer actual notice. And like the victim in *P.H.*, LD hid her relationship about Robeson and did not report sexual misconduct until Robeson was arrested. While

18

Robeson's actions and excessive attention were cause for concern, the evidence was insufficient to establish actual knowledge of sexual misconduct for purposes of Title IX.

Plaintiffs also suggest that Bartels had notice of the relationship between LD and Robeson due to Robeson's email of April 21, 2014. Bartels asked Robeson to send photos of a field trip, and Robeson complied. Attached to the photos were several pages of text messages between Robeson and LD. In the messages, Robeson lamented that he would not move grades with LD; he spoke of their "relationship;" and he told her that he planned to see her at least once a week in the next school year. While Bartels admitted that the messages would be cause for alarm, it is undisputed that Bartels did not see the messages when Robeson sent the email and did not read them until after Robeson had been arrested. Moreover, although the messages were highly inappropriate, like the inappropriate messages in *Flaherty*, the content of the messages did not describe sexual conduct or abuse. Accordingly, the unread messages were insufficient to convey actual knowledge.

### B. Deliberate Indifference

A response to reports of actual harassment demonstrates deliberate indifference only when the response is clearly unreasonable. *Davis*, 526 U.S. at 648; *see also Gebser*, 524 U.S. at 290 (equating deliberate indifference standard under Title IX to deliberate indifference standard under 28 U.S.C. § 1983). Deliberate indifference is "stringent standard of fault that cannot be predicated upon mere negligence." *Flaherty*, 623 F.3d at 584 (citing *Shrum,* 249 F.3d at 780) (internal quotation marks omitted).

When assessing deliberate indifference under Title IX, courts must examine the adequacy of the response in light of the "seriousness and credibility of the compliant that

puts school officials on notice." *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). A response is not deliberately indifferent unless it amounts to "an official decision by [school officials] not to remedy the violation." *Gebser*, 524 U.S. at 290. For example, in *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610 (8th Cir. 1999), OPS, through one of its principals, became aware of a sexual relationship between a teacher and student. The court concluded that OPS and the principal did not act with deliberate indifference because they did not "turn a blind eye and do nothing." *Id.* Instead, they investigated the allegations and initiated termination proceedings "once they obtained conclusive proof of that relationship." *Id.* Accordingly, OPS and the principal were entitled to judgment as a matter of law. *Id.*

Similarly, in this case, OPS and Bartels did not turn a blind eye to the allegations against Robeson. When Galbraith reported that she saw Robeson grab LD's phone from her back pocket, Bartels responded by investigating and warning Robeson not to engage in that type of conduct. Bartels Dep. 105:6–107:3, ECF No. 128-1. When Galbraith witnessed Robeson hug[7] LD in the hallway and saw Robeson eating lunch with LD in his classroom, with the door closed and lights dim, Bartels responded by investigating whether LD and Robeson were in the classroom. Although no one was in the classroom

---

[7] Plaintiffs' statement of this incident implies that Gailbraith saw LD and Robeson hugging in Robeson's darkened classroom. Defendants do not dispute this account in their joint reply but the Plaintiffs' description is unsupported. The lone factual reference to this fact is "SOF 127" but Statement of Fact 127 is inconsistent with Plaintiffs' characterization. It states that Gailbraith witnessed a hug outside the classroom. Gailbrath's deposition does not support Plaintiffs' statement.

at the time of the security check, Bartels advised Robeson that such conduct was inappropriate. In light of the facts he knew at the time, Bartels's response was not deliberately indifferent.

Bartels also did not act with deliberate indifference to generalized reports of Robeson's relationship with LD. When Stichler expressed concern via email to Walker about the amount of time Robeson spent with LD, Bartels was copied on Walker's response that she would contact LD's parents to discuss the activity. Bartels Dep. 22:12 – 23:1, 42:14–19, ECF No. 128-1. Bartels received notice of Stichler and Walker's concerns and of their plans to resolve them.

When Stichler observed Robeson inappropriately touching female students and giving a hug to a female student, Bartels advised Stichler to consider contacting child protective services. Stichler contacted CPS, and CPS declined to investigate. OPS responded by requiring Robeson to go through counseling and discipline. Based on facts known at the time, the response was not deliberately indifferent.

In sum, there is no evidence that Bartels or OPS knew the nature of Robeson's misconduct or responded with deliberate indifference. Accordingly, OPS is entitled to judgment as a matter of law on Plaintiffs' Title IX claims.

## II. Claims Against Bartels Under § 1983

Suits against school officials in their official capacity are treated as suits against the school district itself. *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 609 (8th Cir. 1999). "[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." *Alexander v. Hedback*, 718 F.3d

762, 766 n.4 (8th Cir. 2013) (*citing Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir.1999)).

Plaintiffs' § 1983 claims no not expressly or unambiguously state that Bartels is sued in his individual capacity. Plaintiffs' second claim alleges Bartels violated LD's constitutional rights to due process, including the "right to be free from deliberate indifference" of Bartels and others "about reports of sexual harassment by a public school teacher against a student based on her gender." Complaint ¶¶ 20.4, 50, ECF No. 1. In paragraph 52, Plaintiffs "request relief as authorized by 42 U.S.C. §§1983, 1988" and "seek general and special damages against the individuals sued." However, Plaintiffs fail to expressly indicate, in either the caption or elsewhere, whether Bartels is being sued in his individual capacity.

Even if the Complaint could be construed as a suit against Bartels in his individual capacity, the § 1983 claim must be dismissed. Under Eighth Circuit precedent, "[a] supervisory school official may not be sued in his individual capacity, either directly under Title IX or under § 1983 based upon a violation of Title IX." *Cox v. Sugg,* 484 F.3d 1062, 1066 (8th Cir.2007); *see also Jenkins v. Univ. of Minnesota*, 131 F. Supp. 3d 860, 878 (D. Minn. 2015), *aff'd,* 838 F.3d 938 (8th Cir. 2016). Although pled under § 1983, the Complaint relies expressly on Title IX's standard of proof. *See* Complaint ¶¶ 20.1, 20.4, 23, ECF No. 1 (alleging violations under § 1983 based on "deliberate indifference by public school administrators about reports of sexual harassment."). Further, because Plaintiffs' § 1983 claims are based on the alleged Title IX violations, they must be examined under the same standard as Title IX. *See Doe v. Flaherty*, 623 F.3d 577, 583

(8th Cir. 2010). Thus, Plaintiffs' § 1983 claims must be dismissed for the same reasons that their Title IX claims will be dismissed.

## III. Political Subdivisions Tort Claims Act

The Nebraska Political Subdivisions Tort Claims Act (NPSTCA), Neb. Rev. St. § 13-901 *et seq.*, waives immunity of political subdivisions, in part, for negligent acts of their employees. *Doe v. Omaha Pub. Sch. Dist.*, 727 N.W.2d 447, 453 (Neb. 2007). Political subdivisions retain their sovereign immunity with respect to several listed exceptions in § 13-910. "If a political subdivision proves that a plaintiff's claim comes within an exception pursuant to § 13-910, then the claim fails based on sovereign immunity, and the political subdivision is not liable. *Omaha Pub. Sch. Dist.*, 727 N.W.2d at 454. Two exceptions bar Plaintiffs' claims in this case: the intentional torts exception and the discretionary function exception.

### A. Intentional Torts Exception

Public employers do not waive immunity for claims "arising out of" intentional torts, including assault or battery. *See* § 13-910(7). Plaintiffs seek to avoid the intentional tort exception by pleading their negligence claims as claims for negligent supervision and retention. In analyzing statutory language from the Nebraska State Tort Claims Act, Neb. Rev. Stat. § 81-8,219, materially identical to § 13-910(7), the Nebraska Supreme Court stated that "[w]here the plaintiff's tort claim is based on the mere fact of government employment (such as a respondeat superior claim) or on the employment relationship between the intentional tort-feasor and the government (such as a negligent supervision or negligent hiring claim), the exception . . . applies and the State is immune from suit." *Johnson v. State*, 700 N.W.2d 620, 625 (Neb. 2005) (internal citation omitted). To permit

otherwise, would "frustrate the purposes of the exception." *Id.* (quoting *Sheridan v. United States*, 487 U.S. 392, 406–07 (1988) (Kennedy, J., concurring in judgment)).

Although pled as claims for negligent supervision and retention, Plaintiffs' negligence claims arise out of Robeson's sexual assault. Plaintiffs' primary allegations are that OPS failed to recognize signs that Robeson was a sexual predator, and his continued employment allowed him to engage in a sexual relationship with a minor student. OPS's liability in this matter is based on the employment relationship between Robeson and OPS. Plaintiffs' claims regarding LD's sexual assault therefore arise out of the employment relationship between Robeson and OPS and are barred by the NPSTCA.

### B. Discretionary Function Exception

Under the discretionary function exception, "a plaintiff may not recover for a claim 'based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of the political subdivision or an employee of the political subdivision, whether or not the discretion is abused.'" *Larson by Larson v. Miller*, 76 F.3d 1446, 1456 (8th Cir. 1996) (quoting Neb. Rev. Stat. § 13–910(2)). "The purpose of the discretionary function exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Doe v. Omaha Public School Dist.*, 727 N.W.2d 447, 456-57 (Neb. 2007). The discretionary function exception applies to "basic policy decisions made in governmental activity, and not to ministerial activities implementing such policy decisions." *Id.* at 457. Nebraska courts use a two-step analysis when determining the applicability of the discretionary function exception. *Id.* at 457. The court first must consider whether the action is a matter of choice for the employee. *Id.* If the

court concludes the action involves an element of judgment, the court then determines "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.*

Applying Nebraska law, the court in *Larson* concluded that decisions to "investigate, hire, fire, and retain" employees are generally discretionary decisions, and held a school district's decision to relocate and then terminate an employee that allegedly sexually abused a student fell within the discretionary function exception to the PSTCA. 76 F.3d at 1457. The Eighth Circuit recognized that an official's duty to report under the Nebraska child abuse-reporting statute was discretionary, not ministerial. *Id.* The court reasoned that whether "'reasonable cause' exists within the meaning of the statute requires an exercise of discretion and personal judgment, which takes the matter out of the realm of a ministerial act." *Id.* (quoting Neb. Rev. Stat. § 28-711); *see also K.B. v. Waddle*, 764 F.3d 821, 825 (8th Cir. 2014) (stating that duty under child abuse-reporting statute was discretionary and noting an official's exercise of poor judgment still does not negate discretionary nature of act).

The decisions of OPS and Bartels that led to Plaintiffs' claims were discretionary functions. The undisputed facts show that OPS delegated responsibility for enforcing school policies to principals, depending on the situation and context. Bartels used his discretion to evaluate each situation reported, to decide what investigation would occur, and to respond with any discipline warranted. He and other OPS administrators were required to make choices, using their judgment, and such discretionary functions are not to be second guessed through the medium of tort under the NPSTCA.

**IV. Aiding and Abetting Intentional Infliction of Emotional Distress**

Plaintiffs allege that Bartels aided and abetted Robeson in intentionally inflicting emotional distress on LD. To the extent such a claim is not barred by the NPSTCA, Plaintiffs have failed to show that Bartels aided or abetted Robeson's actions. Under Nebraska law, the standard for civil aiding and abetting is the same as the standard for criminal aiding and abetting. Generally, "one who counsels, commands, directs, advises, assists, or aids and abets another individual in the commission of a wrongful act or tort is responsible to the injured party for the entire loss or damage." *Bergman v. Anderson*, 411 N.W.2d 336, 340 (Neb. 1987) (approving civil aiding and abetting jury instructions adapted from jury instructions meant for criminal aiding and abetting). "Aiding and abetting involves some participation in the criminal act or involves some conscious sharing in the criminal act, as in something that the accused wishes to bring about, in furtherance of a common design, either before or at the time the criminal act is committed, and it is necessary that he seeks by his action to make it succeed." *State v. Foster*, 242 N.W.2d 876, 879 (Neb. 1976).

Here, no facts suggest that Bartels ever intentionally encouraged or intentionally helped Robeson inflict emotional distress on LD. Accordingly, the claim for aiding and abetting intentional infliction of emotional distress will be dismissed.

## CONCLUSION

The Plaintiffs have not come forward with evidence raising any genuine issues of material fact as to whether Bartels or OPS were aware of the nature of Robeson's sexual misconduct. Nor have Plaintiffs presented evidence that Bartels or OPS were indifferent to what they knew. Finally, OPS and Bartels are not liable under Nebraska tort law.

IT IS ORDERED:

1. The Motions for Summary Judgment filed by Defendant Douglas County Public School District No. 001, a/k/a Omaha Public Schools (OPS), ECF No. 124, and Defendant Daniel Bartels, ECF No. 132, are granted;

2. All claims against the Doe Defendants, OPS, and Daniel Bartels are dismissed, with prejudice,

3. All other pending motions and objections are denied as moot; and

4. The Clerk of Court is directed to remove the Doe Defendants, OPS, and Bartels from the case caption.

Dated this 1st day of November 2019.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge
